UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | 1:10-cr-151 |
| ) | |
| LEONEL LOPEZ-URQUIZA, ) | Judge Collier/Carter |
| also known as, "Juan Carlo Santiago-Rivera." ) | |

REPORT AND RECOMMENDATION

I. Introduction

The defendant's Motion to Suppress (Doc. 21) is before the undersigned Magistrate Judge having been referred by the District Court for a Report and Recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). Defendant Leonel Lopez-Urquiza moves to suppress all evidence obtained as a result of his detention and interrogation and the search of the vehicle he was driving on November 4, 2010 on the ground that the search was conducted during an illegal detention in violation of the Fourth Amendment and statements were obtained in violation of the Fifth Amendment. For the reasons stated herein, I RECOMMEND the defendant's motion to suppress be DENIED.

II. Relevant Facts

Hearings were held on the defendant's motion to suppress on Thursday, February 17, 2011 and Wednesday, February 23, 2011. In the February 17 hearing, Drug Task Force Officer Shane Daugherty of the 17th Judicial District testified as did Chris Smith, the Assistant Director of Interdiction of the 12th Judicial District Drug Task Force. I found their testimony to be credible.

Officer Daugherty testified to the following: On the morning of November 4, 2010, at approximately 6:00 am, he was sitting stationary at the 130-mile marker on I-24 in Grundy County, Tennessee, monitoring westbound traffic. His vehicle was perpendicular to the westbound traffic, just to the west of a sign which marked the change of speed limit back up to 70 miles per hour. The vehicle he stopped was traveling in that portion of the westbound traffic where the speed limit was 55. He noticed the defendant's vehicle traveling faster than 55 mph in the process of decelerating as it came down Monteagle Mountain. He turned on his radar, and clocked the vehicle traveling at 70 mph in a 55 mph zone. Logically, that means the vehicle was in fact traveling faster than 70 mph in the 55 mile per hour zone since he was able to tell it was in the process of slowing down. He pulled out and initiated a traffic stop of a Silver Nissan Armada displaying a Georgia temporary tag. Defendant first pulled his car to the left side of the freeway but Officer Daugherty directed him to move his vehicle to the right side of the freeway at a nearby exit. During the encounter, all of which is recorded on video with audio, the driver and sole occupant of the vehicle (who was later identified as the defendant, Lopez-Urquiza) handed Daugherty a Georgia Driver's License identifying him as Juan Carlo Santiago-Rivera. The defendant admitted he was speeding and said he did have at least one prior speeding ticket. He was only able to produce a bill of sale for the vehicle which showed the vehicle was purchased by another individual. The defendant was unable to provide the name of the person that the vehicle belonged to other than a first name, Sammy. He stated that he had known the owner for either 2 weeks or 2 years, Officer Daugherty was unsure which. However, the owner of the vehicle lived in Athens, Georgia, according to the documents provided by defendant and the owner was not named Sammy. The drivers license presented to Officer Daugherty indicated the

2

defendant also was from Athens, Georgia. This seemed somewhat inconsistent with defendant's explanation that he was on his way to Chicago from Atlanta to see his sick sister. On several occasions the defendant would say "we" were traveling to Chicago, even though he was the only person in the vehicle. Those comments caused Officer Daugherty to recall a pickup traveling in front of the defendant with Illinois license plates. Daugherty testified he was concerned for his safety at that point because the other vehicle could have been there for protection. He was aware that drug dealers often travel in multiple cars for security purposes. While Daugherty was questioning the defendant he could see his Carotid artery pulsating and noted defendant seemed fidgety and anxious. His nervousness appeared to increase rather than subside. In Daugherty's experience this was unusual.

      Officer Daugherty returned to his vehicle and asked Officer Chris Smith to come and assist on the traffic stop. Officer Smith arrived a few minutes later and began running the computer checks. Daugherty asked questions about whether there were drugs, guns or large sums of money in the vehicle. When Daugherty asked if there were guns the defendant responded "no, you can search if you want." Daugherty then said "so you give consent" and the defendant said "yes." Thus, the defendant gave oral consent to search the vehicle and did so in English. After the defendant gave oral consent, Daugherty then obtained a written consent to search from the defendant written in Spanish. During the duration of the traffic stop Daugherty speaks with defendant in English and defendant responds appropriately in English. Daugherty testified the defendant did not appear to have a problem understanding English. However, defendant did tell Daugherty he was more comfortable with reading in Spanish so the Spanish language consent form was given to defendant for his review. The video of the stop shows the defendant

3

reviewing the document for approximately a minute and then signing it. The form did not have any provision indicating the right to withdraw consent, however, at no time did the defendant do anything to indicate he wanted to withdraw his consent.

After obtaining oral and written consent, Daugherty began the search. He noticed scarred bolts and missing clips around the front fenders when he raised the hood. He then searched the interior of the vehicle. After further examination under the hood where he noticed overspray on rubber grommets, he took a screwdriver and pulled back the fender well lining and could see a hole cut in the inner fender and inside that hole a red plastic wrapped container which in his experience indicated contraband or drugs were being transported. During the initial search three packages wrapped in red plastic were recovered. The defendant was placed under arrest and advised of his *Miranda* rights, which he stated that he understood and waived. He explained that he was being paid $1,500.00 to take the truck to Chicago and this was his first trip. He did not want to provide the name of the individuals for whom he was working. Daugherty field tested the substance found in the packaging in the fender well, and it tested positive for methamphetamine.

The defendant later told agents that his real name was Leonel Lopez-Urquiza, born on May 28, 1974, and he was a citizen of Mexico. The defendant admitted that he is in the country illegally and has a prior felony drug conviction in Georgia.

The vehicle the defendant was driving was impounded and searched even more thoroughly the night of November 4th. Officers discovered a fourth package of methamphetamine.

Officer Chris Smith of the 12th Judicial District Drug Task Force and Assistant Director of Interdiction testified. Smith was involved in calling BLOC to run the license given to them by the defendant. He was involved in the search and also transported defendant to the Monteagle Police Department. Smith was aware that *Miranda* rights had been read to the defendant He had a general conversation with the defendant in English.

DEA Task Force Officer Danny Warren of the Franklin County Sheriff's Department testified that he was involved in the arrest. He was called to the scene and spoke with the defendant. He had been advised that the defendant was read his *Miranda* rights. He asked if defendant wanted to cooperate to help himself out. The defendant replied no that he would go do his time.

### III. Analysis

Police may detain a person based on probable cause to believe that person has violated a traffic law. *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996) (so long as the officer has probable cause to believe that a traffic violation has occurred, the resultant stop is not unlawful and does not violate the Fourth Amendment); *United States v. Ferguson*, 8 F. 3d 385, 391 (6th Cir. 1993) (A traffic stop is reasonable if there is probable cause to believe a traffic violation occurred and what else the officer suspected about the driver is irrelevant). "A traffic stop is analogous to a "Terry stop" in that, following the initial stop, the subsequent detention cannot be excessively intrusive and must be reasonably related in time to the investigation." *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999); s*ee also*, *United States v. Wilson,* __F.3d__, 2007 WL 3131682, *3 (6th Cir. October 29, 2007) ("An ordinary traffic stop is like an investigative detention, the scope of which is governed by *Terry* [*v. Ohio*, 392 U.S. 1 (1968)]

principles") (brackets added) (quoting *United States v. Perez,* 440 F.3d 363, 370 (6th Cir.2006)). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Perez,* 440 F.3d 363, 372 (6th Cir.2006) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). "The investigative means used should be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time." *Perez*, 440 F.3d at 372 (citing *Royer*, 460 U.S. at 500).

Once the purpose of the traffic stop is completed, the officer may not continue to detain the vehicle or its occupants unless, during the stop, further information arises to support reasonable suspicion sufficient to justify continued detention. *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995); *Perez*, 440 F.3d at 370.

A vehicle stop is reasonable when a law enforcement officer has probable cause to believe he has witnessed a traffic violation, even if the traffic offense is minor and the officer has additional subjective reasons for making the stop. *Whren v. United States*, 517 U.S. 806, 810, 812-13 (1996); *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003); *United States v. Harvey*, 16 F.3d 109, 112 (6th Cir. 1994), *cert. denied*, 513 U.S. 900 (1994); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993), *cert. denied*, 513 U.S. 828 (1994).

The courts have abandoned the former rule on so-called "pretextual" stops and now disregard an officer's subjective intentions as long as the stop itself is based on a proper purpose such as probable cause or reasonable suspicion. *See, e.g., Arkansas v. Sullivan*, 532 U.S. 769 (2001)(reversing Arkansas Supreme Court's attempt to consider an officer's subjective motivation for making a valid traffic stop); *Whren v. United States*, 517 U.S. 806, 810, 812-13 (1996)("Subjective intentions play no role in ordinary, probable cause Fourth Amendment

analysis."); *United States v. Johnson,* 242 F.3d 707, 709-10 (6th Cir. 2001), *cert. denied*, 534 U.S. 863 (2001)(upholding stop for broken taillight in violation of Tennessee traffic laws regardless of officer's subjective motivation); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993), *cert. denied*, 513 U.S. 828 (1994).

Nevertheless, "'a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.' *Illinois v. Caballes*, 543 U.S. 405, 407 . . . (2005)." *United States v. Everett*, No. 09-5111, 2010 U.S. App. LEXIS 7107 at *8 (6th Cir. April 6, 2010). *Everett*, a recent Sixth Circuit opinion that details the law concerning the prolongation of a traffic stop, continues:

> To qualify as reasonable seizures under the Fourth Amendment, *Terry* detentions must be "limited in [both] scope and duration." *Florida v. Royer*, 460 U.S. 491, 500, . . . (1983); *see also United States v. Hensley*, 469 U.S. 221, 235 . . . (1985) (stating that "length and intrusiveness" of a stop are relevant to *Terry* analysis). Under *Terry's* duration prong, a stop "must . . . last no longer than is necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500. Under its scope prong, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Ibid.*; *see also United States v. Sharpe*, 470 U.S. 675, 682 . . . (1985) (stating that stop must be "reasonably related in scope to the circumstances which justified the interference in the first place").

*Everett* at *9-10. "[A]n officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity 'would be well within the bounds of the initial stop.'" *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999) (further citations omitted).

Where an officer does extend the length of the stop, he must have a reasonable suspicion to justify the extension.

> "Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the

7

continued detention of a motorist after a traffic stop." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (citing *Terry v. Ohio*, 392 U.S. 1, 21 . . . (1968)). "'Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person . . . of criminal activity.'" *Id*. (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 . . . (1981)) (alteration in original).

*United States v. Bell*, 555 F.3d 535, 540 (6th Cir. 2009). To determine whether a traffic stop was unlawfully prolonged, the reviewing court should test "whether he was detained longer than reasonably necessary for the Officers to complete the purpose of the stop in this case. *See* [*Illinois v.* ]*Caballes*, 543 U.S. [405 ]at 407[ (2005)]; *United States v. Sharpe*, 470 U.S. 675, 685-86 . . . (1985)." *Id* at 541. Within such review, the court should include:

> "whether [the Officers] improperly extended the duration of the stop to enable the dog sniff to occur" in the particular circumstances of this case. *Caballes*, 543 U.S. at 408; *see also Sharpe*, 470 U.S. at 686 ("In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.").

*Id*. The Sixth Circuit has held that an officer's reasonable suspicion justifies both further detention and brief questioning during the course of a traffic stop without it resulting in an arrest. *United States v. Palomino*, 100 F.3d 446, 450 (6th Cir. 1996). *See, also, United States v. Bradshaw*, 102 F.3d 204, 211-12 (6th Cir. 1996)(detention in patrol car while officer issued traffic citation did not constitute and arrest), *cert. denied*, 520 U.S. 1178 (1997); *United States v. Winfrey*, 915 F.2d 212, 216-17 (6th Cir. 1990) (15 minute detention for questioning by DEA agents permissible).

In this case, I conclude the police were justified in the initial stop and detention. The defendant was clearly speeding. It was a lawful stop. Thus, the inquiry turns to whether the officer extended the time needed for the initial traffic stop and if so, whether he had a reasonable

suspicion to extend the duration of the stop.  The time from the original traffic stop until Officer Daugherty received consent from the defendant to search was approximately 15-20 minutes.  The only documentation provided to the officer during the stop showed that the car was insured by someone other than the defendant.  The defendant did not know the name the owner of the vehicle and said he had only known him for two weeks or perhaps for two years, but in either event, it is highly suspicious that a person would not know the name of a person from whom he had borrowed a car for a long trip.  The defendant further explained he was driving from Atlanta to Chicago which was inconsistent with the bill of sale and the license which showed Athens, Georgia was the home of the vehicle owner and the defendant.  The defendant had on several occasions said "we" are going to Chicago, although he was the only person in the vehicle.  Officer Daugherty recalled a companion vehicle with Illinois plates traveling just in front of the defendant's vehicle  Based on his experience, Daugherty suspected this was a follow car used to be sure the other driver gets to his destination or because they may not trust the driver.  Because of this the officer was concerned for his safety.  In addition, the defendant appeared to be unusually nervous and his level of nervousness increased rather than subsiding.

I conclude the defendant was speeding, and the defendant's story reasonably raised Officer Daugherty's suspicion.  As the Government argues, an experienced drug investigator like Daugherty recognizes the signs of narcotics trafficking.  The following circumstances pointed to a drug-related trip: the fact that someone was driving a Nissan Armada from Atlanta to Chicago, possessed no paperwork tying himself to the vehicle, having claimed he "borrowed" it from someone whose full name he did not know; the name given did not match the name on the bill of sale; the references to "we" are going to Chicago indicating the presence of a second vehicle in

light of the officer's observations of a second vehicle with Illinois tags; and the fact that the defendant was fidgeting in his seat and appeared uncomfortable beyond that associated with a normal traffic stop. I agree with the Government that these circumstances in combination established sufficient reasonable suspicion to justify a continued inquiry and investigation.

Here the consent was obtained prior to the conclusion of the traffic stop and the actual discovery of the hidden compartment was only approximately 6 minutes after the return of the information from BLOC. Officer Daugherty called for backup shortly after making the stop, which clearly supports the notion that he was suspicious of drug activity and believed there was ample justification for continuing the stop.

When Officer Chris Smith arrived after Daugherty called for backup, Smith performed the computerized record checks while Daugherty continued to speak with the defendant and got consent to search. Thus, Daugherty continued to diligently pursue the investigation in a timely manner by performing multiple law enforcement functions simultaneously and ensuring that the stop was not prolonged past what was necessary to confirm or deny his suspicions. *See Sharpe*, 470 U.S. at 686. These checks were not even complete at the point the defendant gave consent to search, nor had the speeding ticket been issued, meaning that the purpose for the original traffic stop had not been completed.

At the time of the consent to search all of the investigation related to the speeding ticket was not concluded. However, the actual discovery of the drugs was made about six minutes after the information came back from BLOC which would conclude the traffic investigation. Defendant argues the search, which began pursuant to the consent, could not continue without the police expressly telling the defendant he was free to go as soon as the report came back from

BLOC. However, because consent was previously given prior to the conclusion of the traffic stop investigation and because the consent to search was never withdrawn, I conclude there was no constitutional violation. In addition, there was ample evidence to support a reasonable suspicion that some illegal conduct was afoot. I therefore conclude the stop was not unreasonably extended. Sufficient information arose during the stop to support a reasonable suspicion to justify continued detention. An extension of six minutes in these circumstances would not be unreasonable.

In this case, Daugherty acted promptly and diligently – immediately contacting his backup, methodically observing the defendant, and rationally drawing conclusions from his observations and information – to establish reasonable suspicion before detaining the defendant further and searching the defendant's vehicle.

Validity of Consent

The defendant knowingly and voluntarily consented to a search of the vehicle. The defendant first gave oral consent to search in English. He then was given a consent form in Spanish by Daugherty and he agreed to the search of the vehicle after a review of the document. The video of the stop clearly shows Daugherty allowing defendant to read the consent form, written in Spanish. The defendant then signed the consent form.

In *Schneckloth v. Bustamante*, 412 U.S. 218 (1973), the Supreme Court stated that whether a consent to search was "voluntary" or resulted from coercion or duress "is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. There are many cases which have addressed the voluntariness of consent to search. For consent to be voluntary, it must be unequivocal, specific, intelligently given, and free from duress or coercion. *United*

*States v. Erwin,* 155 F.3d 818, 823 (6th Cir. 1998)(citing *United States v. Scott*, 578 F.2d 1186, 1188-89 (6th Cir. 1978)). The government does carry the burden of establishing through "clear and positive testimony" that law enforcement officials obtained a valid consent to search. *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996).

From the facts of the instant case, it is clear that the defendant was not coerced into consenting to the search of the vehicle, and that his consent was voluntary, unequivocal, specific and intelligently given. Furthermore, the defendant was free from duress or coercion at the time he gave consent. *United States v. Erwin*, 155 F.3d 818 (6th Cir. 1998).

In *United States v. Crowder*, 62 F.3d 782 (6th Cir. 1995), the United States Court of Appeals for the Sixth Circuit listed a number of factors for courts to consider in determining whether a consent to search was given voluntarily, including: minimal schooling; low intelligence; lack of effective warnings to the defendant of his rights; the accused's knowledge of his right to refuse to consent; absence of any overt act or threat of force against the defendant; absence of any promises to the defendant or any indication of more subtle forms of coercion that might flaw his judgment; the defendant's giving his post-arrest consent on a public street and not in the confines of a police station; the absence of any indication that the defendant was a newcomer to the law, mentally deficient, or unable in the face of custodial arrest to exercise free choice; and the defendant's receiving *Miranda* warnings and notifications that the results of the search could be used against him. *Crowder* at 787 (citations omitted).

A language barrier is a factor to consider when determining the validity of a waiver. *United States v. Alaouie*, 940 F.2d 663, 1991 WL 144479, at 4 (6th Cir.1991) (*citing United States v. Heredia-Fernandez,* 756 F.2d 1412, 1415 (9th Cir. 1985)("One precondition for a

voluntary custodial confession is a voluntary waiver of *Miranda* rights, and language difficulties may impair the ability of a person in custody to waive these rights in a free and aware manner")). In *United States v. Gonzales,* 749 F.2d 1329, 1336 (9th Cir.1984) the Court held that even when a suspect spoke poor English and a police officer spoke poor Spanish, a written Spanish form sufficed. As the Sixth Circuit stated in *Alaouie*, "[t]he determination is not difficult when the suspect is advised of his rights in a language that he understands." Other courts have similarly held, frequently with language barriers greater than those encountered in the instant case. *See United States v. Boon San Chong,* 829 F.2d 1572, 1574 (11th Cir.1987) ("Chong was advised of his rights in both his native language and English and claimed to understand those rights. His election to answer questions shortly after reading the Chinese Advice of Rights form indicates that he was knowingly waiving his rights despite the language problems."); *Perri v. Director, Dep't of Corrections,* 817 F.2d 448, 452-53 (7th Cir.1987)(where defendant was given his rights in Italian and stated in English that he understood those rights, waiver was knowing and intelligent); *United States v. Bernard S.,* 795 F.2d 749, 752 (9th Cir.1986)(defendant, a juvenile whose native language was Apache and neither read nor wrote English, validly waived his rights).

There is simply no evidence that the defendant's consent to search the vehicle was anything but voluntary. As defendant argues, it is a subjective standard and it is true that English is not the defendant's first language. However, the video of the stop shows defendant was able to converse in English with Officer Daugherty. He was asked if he would consent to a search of the vehicle. He was not tricked, deceived, coerced or threatened into giving consent. There is no evidence of any attempt by the defendant to withdraw his consent. There is no sign of any

13

coercion on the part of the officer. Accordingly, I conclude the defendant's consent was valid under the totality of the circumstances, there was no attempt on the part of the defendant to withdraw his consent. The statements given are therefore admissible.

<u>The Questioning of the Defendant was Lawful</u>

The defendant asserts that Officer Daugherty violated his rights by questioning him at the scene without advising him of his rights. This contention is without merit.

A law enforcement officer may stop and detain an individual for investigative reasons when reasonable suspicion exists to believe that the defendant is engaging in criminal activity. *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Williams*, 962 F.2d 1218, 1223-24 (6th Cir.)(Automobile stop and search for weapons based on reasonable suspicion permissible), *cert. denied*, 506 U.S. 892 (1992).

So-called *Miranda* warnings are required when a subject is interrogated while in custody or its functional equivalent. *Miranda v. Arizona*, 384 U.S. 436 (1966). Courts apply a totality of the circumstances test to determine whether a "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). Questioning that takes place outside in a public area combined with a statement by the police that an individual is not under arrest weighs in favor of defining a temporary detention as a non-custodial interrogation. *United States v. Swanson*, 341 F.3d 524, 529-31 (6th Cir. 2003).

The defendant asserts the stop of the vehicle itself essentially amounted to an arrest rather than a *Terry* detention. I disagree. A traffic stop does not amount to the kind of formal arrest contemplated in *Berkemer*. Because the mere use or display of force when making a *Terry* stop does not necessarily turn the stop into an arrest, the defendant's argument is without merit. *See,*

*e.g., United States v. Hardnett*, 804 F.2d 353 (6th Cir. 1986)(officers ordering suspects out of a vehicle at gunpoint did not exceed bounds of permissible *Terry* stop), *cert. denied,* 479 U.S. 1097 (1987); *United States v. Garza* (10 F.3d 1241 (6th Cir. 1993) (Same). Officer Daugherty engaged in a routine traffic stop and additionally advised the defendant during the course of the stop that he would get him back on the road. Nothing about the temporary detention associated with such a traffic stop amounts to the curtailment of an individual's freedom of action to a degree that amounts to a formal arrest, as contemplated in *Berkemer*.

Statements made by a suspect while in custody must be preceded by Miranda warnings in order for those statements to be admissible. *United States v. Crowder*, 62 F.3d 782, 785 (6th Cir. 1995). The Fifth Amendment requires Miranda warnings be given where a person is subject to custodial interrogation. *Dickerson v. United States*, 530 U.S. 428 (2000); *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977). However, the test for determining when a detention has occurred for purposes of the Fourth Amendment and when a custodial detention has occurred for purposes of the Fifth Amendment are not the same. *Berkemer v. McCarty*, 468 U.S. 420, 436- 41 (1984); *United States v. Salvo*, 133 F.3d 943, 949 (6th Cir. 1998); *accord United States v. Knox*, 839 F.2d 285, 289-291 (6th Cir. 1988). The test for determining whether a seizure has occurred under the Fourth Amendment is whether a reasonable person in the defendant's position would have felt free to leave, given the totality of the circumstances. For Fifth Amendment purposes, however, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *see also Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken

into custody or otherwise deprived of his freedom of action in any significant way."); *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000) (same). Thus, it is possible for a person to be detained but not in custody for purposes of requiring Miranda rights. *Berkemer v. McCarty*, 468 U.S. 420, 427 (1984).

In the instant case, the defendant was detained as soon as his vehicle was pulled over, but he was not "in custody" for Fifth Amendment purposes until Officer Daugherty placed defendant under arrest for possession of the drugs found in the car. There was no arrest prior to the discovery of contraband hidden in the vehicle, there was no "custody" for Miranda purposes, and thus the situation did not trigger the requirement to advise the defendant of his rights. Later, Daugherty *did* advise the defendant of his rights in the patrol car before proceeding with additional questioning. Neither the defendant's pre-*Miranda* statements nor post-*Miranda* statements will be suppressed.

Finally, defendant argues he invoked his right to counsel and therefore any further questioning should have stopped. The law controlling this question is set forth in *Davis v. United States*, 512 U.S. 452, at 452,453, 114 S. Ct. 2350 at 2352:

> After a knowing and voluntary waiver of rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, law enforcement officers may continue questioning until and unless a suspect clearly requests an attorney. A suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. *Id*., at 469-473, 86 S.Ct., at 1625-1627. If the suspect invokes that right at any time, the police must immediately cease questioning him until an attorney is present. *Edwards v. Arizona*, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1884-1885, 68 L.Ed.2d 378. The *Edwards* rule serves the prophylactic purpose of preventing officers from badgering a suspect into waiving his previously asserted *Miranda* rights, and its applicability requires courts to determine whether the accused actually invoked his right to counsel. This is an objective inquiry, requiring some statement that can reasonably be construed to be an expression of a desire for an attorney's assistance. However, if a reference is ambiguous or equivocal in that a reasonable

officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, *Edwards* does not require that officers stop questioning a suspect. Extending *Edwards* to create such a requirement would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate investigative activity by needlessly preventing the police from questioning a suspect in the absence of an attorney, even if the *453 suspect does not wish to have one present. The *Edwards* rule provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. This clarity and ease of application would be lost if officers were required to cease questioning based on an ambiguous or equivocal reference to an attorney, since they would be forced to make difficult judgment calls about what the suspect wants, with the threat of suppression if they guess wrong. While it will often be good police practice for officers to clarify whether a suspect making an ambiguous statement really wants an attorney, they are not required to ask clarifying questions.

In this case, after the drugs were recovered from the vehicle, the defendant told Officer Daugherty, in response to a question of whether he wanted to provide information about the people for whom he was working, that he did not but would just go to jail and get a lawyer. Officer Daugherty took this to mean that he would get counsel once he was in jail, not that he did not want to answer any further questions. I conclude this is a reasonable interpretation of the meaning of that statement. Invocation of the right to counsel must be unequivocal. The person invoking the right must clearly show he does not want to answer further questions. If the invocation is not unequivocal, the requirement of *Edwards* that there be no further interrogation by the authorities is not invoked. At no time during the questioning did the defendant indicate he was unwilling to continue talking with the police officers. It was therefore reasonable for the officer to conclude the defendant was commenting on his future intention to have an attorney represent him in court proceedings.

After this comment, that he would go to jail and get a lawyer, Daugherty asked defendant if the tools were his or theirs (referring to those who "loaned" him the car). The defendant said

17

they were theirs. This is one of the statements defendant seeks to suppress. However, I conclude there was no unequivocal request for counsel. Therefore, any statements given by the defendant should not be suppressed.

IV. Conclusion

For the reasons stated herein, I RECOMMEND defendant's Motion to Suppress (Doc. 21) be DENIED.[1]

                                                  *s/William B. Mitchell Carter*
                                                  UNITED STATES MAGISTRATE JUDGE

---

[1] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).