UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | No.: 1:10-cr-151 |
| ) | |
| LEONEL LOPEZ-URQUIZA ) | Collier/Carter |

REPORT AND RECOMMENDATION

Introduction

In his second motion to suppress [Doc. 58] filed in this case, defendant Leonel Lopez-Urquiza challenges the legality of a traffic stop for speeding which led to a search of his vehicle, the discovery of four packages of methamphetamine, and incriminating statements made by defendant. Defendant also moves to set aside Lt. Shane Daugherty's testimony concerning the proper operation of radar equipment [Doc. 73]. Having considered the evidence presented at a second suppression hearing, I conclude Lt. Daugherty had probable cause to believe defendant was speeding and Lt. Daugherty was qualified to testify as to the proper use of radar equipment. Accordingly, it is RECOMMENDED defendant's second motion to suppress and defendant's motion to exclude Lt. Daugherty's testimony regarding the proper use of radar equipment be DENIED.

Relevant Facts

*A. Background*

On November 4, 2010, Lt. Shane Daugherty of the 17th Judicial Drug Task Force pulled over the defendant in his Nissan Armada on I-24 in Grundy County, Tennessee for speeding. According to the government, defendant admitted to Lt. Daugherty that he had

1

been traveling 70 mph in a 55 mph zone. The detention progressed beyond the traffic stop to a search of the vehicle, discovery of contraband, and the arrest of the defendant. Defendant also made statements to police after the initial traffic stop.

Defendant's first motion to suppress, filed on January 20, 2011, alleging violations of his Fourth and Fifth Amendment rights, is based on the same traffic stop as is his second motion to suppress. However, in his first motion, defendant did not challenge the legality of the initial traffic stop; instead, defendant challenged his continued detention after the initial traffic stop, the search of the vehicle, and the subsequent "pre-Miranda" questioning by Lt. Daugherty of the defendant. The undersigned recommended defendant's first motion to suppress be denied. Upon review of the undersigned's report and recommendation, the District Court denied defendant's first motion to suppress.

The undersigned's report and recommendation and the District Court's decision on the first suppression motion did not address the initial traffic stop since it was not then contested. During the course of the evidentiary hearing on the first motion to suppress, however, it became known to the defendant for the first time that Lt. Daugherty's vehicle had been stationed in a 70 mile per hour zone when the radar detector clocked defendant traveling 70 mph and that when defendant admitted traveling 70 mph, defendant had been traveling in the 70 mph zone for about three miles. Moreover, after the hearing on the first motion to suppress, defendant became aware of U.S. District Judge Aleta Trauger's decision in *United States v. Gerardo Ruiz and Luis Alberto Ruiz*, __F.Supp.2d__, 2011 WL 2197651 (M.D. Tenn. June 6, 2011). In *Ruiz*, Judge Trauger found Lt. Daugherty to be an incredible witness – a finding which, according to defendant, casts doubt on Lt. Daugherty's credibility in this case. Because of the new information and because of Judge Trauger's

2

decision, defendant filed this second motion to suppress specifically challenging the legality of the initial traffic stop and asserting that the contraband and all statements he made after the initial traffic stop should be suppressed as fruit of the poisonous tree.

*B. March 7, 2012 Evidentiary Hearing*

Shane Daugherty and Tim Lane were the only witnesses to testify for the government at the March 7, 2012 evidentiary hearing on the defendant's second motion to suppress. Charles Bryan Farmer, whom defendant called as an expert witness on the use of radar detectors, was the only witness for the defense. This second motion focused exclusively on whether Lt. Daugherty had probable cause to stop defendant for speeding on November 4, 2010.

Lt. Daugherty was assigned to the 17th Judicial Drug Task Force from 1996 to 2002 when he joined the Lewisburg, Tennessee Police Department as a detective. He later left the Lewisburg, Tennessee Police Department for the 21st Judicial Drug Task Force where he was employed as a crime interdiction officer and K-9 handler for three years. He returned as a crime interdiction officer of the 17th Judicial Drug Task Force in 2010 and continues to be employed by the 17th Judicial Drug Task Force. In 1996, before he joined the 17th Judicial Drug Task Force and while he was with the Oneida Police Department, he received training and was certified on the proper use of radar detectors. The training included six or eight hours of classroom training followed by a test and then field time followed by another test. In order to pass the training, he had to be able to visually estimate the vehicle's speed of a moving vehicle to within 3 miles per hour of the speed as clocked by the radar detector. Lt. Daugherty was certified on X-band radar. "X-band" indicates the type of antenna used on the radar detector. There are two types of X-band radar, XK and KA. In 1996, he used XK

3

radar. In 2003 or 2004, he switched to KA radar which is what he was using on November 4, 2010 and he still uses today.

According to Lt. Daugherty, the XK and KA radar have primarily the same features with the only major difference between the two being the band width and length of the signal emitted from radar units' antennae. The antenna for a radar detector emits a signal in a cone shape toward oncoming traffic. The XK signal is wider that the KA signal, but the KA signal extends a farther distance than does the XK signal. Lt. Daugherty has used the KA band model three to four days a week for the last four and one half years. He currently employs a Stalker Dual radar detector with KA band. To ensure that the radar is working properly, the Stalker Dual comes with tuning forks, each of which are calibrated to vibrate in such a manner that the Stalker Dual will register a certain speed when the vibrating fork is put in front of the radar detector's antenna. It was Lt. Daugherty's practice to use the tuning forks about once a week. (Transcript of the March 7, 2012 Suppression Hearing at p. 67).[1] There is also a "self-test button" that tests the internal calibrations of the radar unit, and whenever the unit is powered on, it automatically runs the self-check feature and will provide a notice if there is a problem. (Tr. 66). In addition, once a year the radar machine is sent for a "bench test" to a laboratory certified to test radar detectors to ensure it is working properly.

To determine the speed of an oncoming vehicle, Lt. Daugherty first visually estimates the vehicle's speed and then activates the radar detector. The radar detector's antenna emits a signal toward oncoming traffic in the shape of a cone. In Lt. Daugherty's experience, the faster a vehicle is traveling, the higher the noise or "squelch" the radar

---

[1] All references to the transcript of the March 7, 2012 suppression hearing are herein after referred to as "(Tr. __)."

detector emits. If there are two vehicles in the radar detector's "cone of vision," he can push a button on the detector which will cause it to lock onto the faster vehicle and record its speed.

On November 4, 2010 at approximately 6 am when it was still dark, Lt. Daugherty parked his patrol car, a Chevrolet Tahoe, in the median on I-24 at mile marker 130. He was parked roughly perpendicular to the west bound lane in a 70 mph zone. The radar detector was mounted on the dash and its antenna was mounted on a stick attached to the rear fender of the vehicle so that the antenna was pointing directly out the passenger side, rear bay window. Lt. Daugherty had a hand held remote to operate the radar detector. He testified he repositioned his vehicle "a little bit" (Tr. 55) in order to adjust the positioning of the antenna so that the signal covered both lanes of traffic straight down the interstate (Tr. 57). On cross-examination, Lt. Daugherty was asked about the difficulties of insuring that his antenna is properly positioned when it is mounted in the rear of the vehicle.

Q: And I don't quite understand how you would know without getting out of the car and checking the antenna how the antenna was positioned?

A: Well, you use it every day so you know about what angle you want to sit at. But as I stated, you can radar a couple of vehicles and you can see how far the antenna is actually reaching, reposition yourself a little bit and you'll get a little bit additional length out of the positioning of the vehicle in the median. Now, when I say I was perpendicular, I was sitting perpendicular, but I may have been just at a little bit more of an angle than perfect perpendicular.

(Tr. 54). He further testified that when he was using the radar unit, he never moved the antenna itself; he simply moved his vehicle to obtain the best positioning for the antenna because the antenna is mounted on brackets and it is much easier to move the car than the antenna. (Tr. 55).

5

Vehicles coming west toward Lt. Daugherty on I-24 the morning of November 4, 2010, were proceeding in a 55 mph zone down Monteagle Mountain. At the bottom of the mountain there is a small dip which gradually ascends to a small rise ("the rise"). From the rise, the interstate descends slightly in a straight line to mile marker 130 where Lt. Daugherty was parked. It is 1232 feet from the rise to mile marker 130. The speed limit is 55 mph from Monteagle Mountain until a vehicle travels 974 feet *past* the rise – which is 258 feet *before* mile marker 130. At 974 feet past the rise the speed limit changes to 70 miles per hour. The change in the speed zone is marked by a sign.

On November 4, 2010, as Lt. Daugherty looked east up I-24 toward Monteagle Mountain at the oncoming westbound traffic, he could see up the interstate to the rise, but he could not see vehicles on the other side of the rise. Lt. Daugherty had been parked in the median for a couple of minutes and had used the radar detector on a couple of trucks to test its range before defendant came over the rise traveling west toward Lt. Daugherty. When defendant came over the rise, Lt. Daugherty watched him for a couple of seconds and made a visual approximation that defendant was traveling about 70 mph. Lt. Daugherty testified, "[as] the headlights were approaching, it was obvious that [defendant] was traveling faster than the other vehicles that had passed. The majority of the vehicles that had passed, especially during that time of the morning, are tractor trailers. They travel at the speed limit if not a little bit below. So, it's pretty easy to tell whenever a vehicle is traveling 15, 17, or even 20 miles faster than the vehicles that you've been watching." (Tr. 61). He then activated the radar detector and clocked the defendant traveling at 70 mph. Lt. Daugherty testified the defendant was well within the 55 mph zone at that time and there was no other vehicle within the radar's cone shaped line of vision. Lt. Daugherty also testified that if

6

there had been more than one vehicle in the radar's cone shaped line of vision, the radar would have bounced back and forth from vehicle to vehicle and emitted different tones, but it did not in this case. The radar detector Lt. Daugherty used on November 4, 2010 was bench tested approximately four months after the stop and was found to be in good working order.

The government introduced a video for demonstrative purposes. In that video, Lt. Daugherty was in a Dodge Charger equipped with a radar detector and stationed in the same spot where Lt. Daugherty had been on November 4, 2010. The radar detector easily was able to lock on and capture the speed of an oncoming west bound vehicle once it topped the rise on I-24 long before the vehicle reached the 70 mph zone. In the demonstrative video, Lt. Daugherty was parked parallel to I-24, not perpendicular as he had been on November 4, 2010. Lt. Daugherty testified that he could not park perpendicular to I-24 for purposes of the demonstrative video because the Dodge Charger did not have a rear radar antenna; therefore, the only position he could use to direct the radar's antenna toward oncoming traffic was to park parallel to the interstate. (Tr. 50-51). Lt. Daugherty testified that the radar "unit" on the Dodge Charger was taken from the Tahoe he had been driving on November 4, 2010. (Tr. 52). He stated the radar's antenna on the Dodge Charger was pointed in "exactly" the same direction as it was on the Tahoe, but since it was mounted on the front of the Dodge Charger and not the back, the vehicles had to be positioned differently. (Tr. 51-52).

On November 4, 2010, after Lt. Daugherty clocked defendant traveling 70 in a 55 mph zone, he waited for defendant to pass his vehicle. Lt. Daugherty identified the defendant's vehicle as a silver Armada, but he was not able to see inside the Armada even

7

though the Tahoe's headlights were on. Lt. Daugherty testified that once the Armada passed him, he waited for additional vehicles to pass in order to safely pull out into the interstate. At the suppression hearing, Lt. Daugherty explained, "I know I watched the Armada go by. I don't know how long I watched it, but even when you see vehicles coming at you, especially at night, you can't tell if it's in the fast lane or the slow lane, so you're a little more hesitant to pull out not knowing which lane of traffic that they're in." (Tr. 63). It had also begun to drizzle, and he put his wipers on the intermittent setting.[2]

After Lt. Daugherty pulled out into traffic, he caught up with the defendant, activated his blue lights, and stopped the defendant at the 127 mile marker which is three miles after defendant had passed him. At the suppression hearing, Lt. Daugherty did not know how many vehicles he had to pass to catch up to the defendant, but he knew he had passed some. (Tr. 63-65). When Lt. Daugherty approached the passenger side window of defendant's vehicle, he asked the defendant "do you know the speed limit is 55 mph coming down the mountain; how fast were you going?" Defendant responded "65." Lt. Daugherty said "70?" and defendant said, "70." (Tr. 29).

Tim Lane is the director of the 17th Judicial Drug Task Force. The 17th Judicial Drug Task Force had a mutual aid agreement with the 12th Judicial Drug Task Force which authorized Lt. Daugherty to exercise jurisdiction where he was patrolling I-24 on November 4, 2010. Mutual aid agreements between judicial drug task forces are authorized by the State of Tennessee.

---

[2] It is not clear to the undersigned whether the antenna on the Dodge Charger was the same antenna used on the Tahoe. (Tr. 51). However, it does appear that when Lt. Daugherty refers to the radar "unit," he is not including the antenna in that term.

Director Lane testified Lt. Daugherty is "POST" certified every year. "POST" certification stands for Police Officer Standards and Training Commission. Police officers are required to be POST certified every year by taking certain courses mandated by the POST commission. Director Lane is not aware of any special training requirements concerning the use of radar detectors instituted by the POST commission for law enforcement officers in Tennessee. The 17th Judicial Drug Task Force has no policy regarding the use of radar or the testing of radar equipment. Lt. Daugherty is the only person with the 17th Judicial Drug Task Force who uses the radar detector. Director Lane has never had any reason to question Lt. Daugherty's honesty.

Charles Bryan Farmer retired in May 2004 after 22 years with the Tennessee State Highway Patrol (TSHP). He received 40 hours of classroom training and 40 hours of field training in the use of a radar detector. During his tenure with the State Highway Patrol, he used a Golden Eagle and a K-55 model radar detector, but he has never used a Dual Stalker radar detector. He has testified in court regarding the use of radar detectors in speeding cases hundreds of times. The TSHP trained him to park his vehicle parallel to the highway in order to see traffic and the radar unit at the same time without having to turn his head. He has never "shot" radar out a side window.

At the suppression hearing, Mr. Farmer was asked why it is better to park parallel to the interstate rather an perpendicular when using a radar detector:

Q  And do you know the reason that you were to be parallel rather than perpendicular?

A  Well, the reason is it shoots the cone out at an angle where you can set and can see the counting unit in front of you on the dash and you can see in your vision, you can imagine the radar cone going out, and you can also have a good vision as to the traffic coming towards you.

9

(Tr. 105). Mr. Farmer also testified it is very important to have your antenna positioned properly because *any* of the windows in the vehicle can interfere with the signal. (Tr. 106). The last time Mr. Farmer used radar was in 2004, and he does not know if the TSHP presently has any policy concerning parking parallel or perpendicular to the highway when using a radar detector. Mr. Farmer also testified a radar detector with KA band located where Lt. Daugherty was parked on November 4, 2012, could easily lock on and capture the speed of a vehicle as it crested the rise.

Mr. Farmer further testified that he did not find Lt. Daugherty's testimony that he had to wait for traffic to pass before he could pull out behind defendant to be compatible with Lt. Daugherty's testimony that only the defendant's vehicle was in the radar's "cone of vision" when the radar locked onto defendant's vehicle. Mr. Farmer reasoned that if Lt. Daugherty had to wait for other cars to pass before Lt. Daugherty could pull out behind defendant, then the other cars must have been so close behind the defendant that when the radar locked onto defendant, the cars must have been in the "cone."

Mr. Farmer also testified that he became very good at accurately estimating the speed of a vehicle just by looking at it, even at night.

> Q    I don't understand when you've got a vehicle in the dark with the headlights on how you determine by looking at it how fast it's going.
>
> A    It's a, it's a gained expertise. I mean, visually, it is your first, is the first thing you would use and I use the radar to confirm what I visually observed.
>
> Q    And so, you can tell as a trained radar person that car is speeding just by looking at it?
>
> A    Yes.

(Tr. 138).

Analysis

The primary issue before the undersigned is whether Lt. Daugherty had probable cause to believe defendant was speeding when he stopped him on November 4, 2010. The Fourth Amendment prohibits unreasonable searches and seizures. *United States v. Jones*, 132 S.Ct. 945, 958 (2012). However, when police have probable cause to believe the driver of a vehicle has committed a traffic violation, they may stop the vehicle without offending the Fourth Amendment. *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996) (so long as the officer has probable cause to believe that a traffic violation has occurred, the resultant stop is not unlawful and does not violate the Fourth Amendment); *United States v. Ferguson*, 8 F. 3d 385, 391 (6th Cir. 1993) (A traffic stop is reasonable if there is probable cause to believe a traffic violation occurred and what else the officer suspected about the driver is irrelevant). *See also Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003). The government bears the burden to show by a preponderance of the evidence that the traffic stop was lawful. *See United States v. Torres-Ramos*, 536 F.3d 542, 552 (6th Cir. 2008) (requiring the government to prove by a preponderance of the evidence that reasonable suspicion existed to make a warrantless stop of a vehicle); *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) ("The government has the burden of proving the legality of a warrantless search.")

Defendant contends Lt. Daugherty did not have probable cause to believe defendant was speeding when he stopped defendant and, therefore, all evidence seized from defendant's vehicle during the traffic stop must be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States,* 371 U.S. 471, 487–88 (1963). Defendant argues Lt. Daugherty's testimony that the radar detector indicated defendant was traveling 70 mph in a

55 mph zone cannot be relied upon because Lt. Daugherty is not qualified in the use of radar, his patrol car was improperly positioned when he used the radar detector on the defendant's vehicle, Lt. Daugherty's testimony that defendant's vehicle was the only vehicle in the radar's "cone" is not plausible, and Lt. Daugherty is not credible, as determined by a prior court.

First, the undersigned will address defendant's argument that Lt. Daugherty is not qualified to testified regarding the proper use of a radar detector. Defendant asserts a challenge to Lt. Daugherty's qualifications as a radar operator falls under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993).[3]

Federal Rule of Evidence 702 incorporates those standards for expert testimony articulated in *Daubert* and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, (1999). *Leelanau Wine Cellars, v. Black & Red, Inc.* 452 F.Supp.2d 772, 778 (W.D. Mich. 2006). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

The court is the "gatekeeper" for expert testimony, and is charged with ensuring all such testimony is both reliable and relevant. *See Kumho Tire Company, LTD. v. Carmichael*, 526 U.S. 137 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

---

[3] Neither party provided substantive discussion of the specific standards in Fed. R. Evid. 702 or *Daubert* and how they were or were not met in this case.

12

579, 597 (1993). The reliability and relevance inquiries are both extremely fact-specific, and a court is therefore afforded broad latitude, not only in its ultimate determination as to the reliability of expert testimony, but also as to how that reliability is evaluated in relation to the specific facts of the case before the court. *Kumho*, 526 U.S. at 141-42. The United States Supreme Court has recognized that expert testimony can be based upon pure scientific theory, technical expertise, or other specialized knowledge. *Kumho*, 526 U.S. at 148.

It is undisputed by the defendant that a radar detector in proper working order and properly used will accurately measure the speed of a moving vehicle. As previously stated, the question before the undersigned is whether Lt. Daugherty had the necessary expertise to use the radar properly and did use the radar properly. Lt. Daugherty's testimony opining he used the radar detector properly constitutes expert opinion testimony since knowledge of the proper operation of a radar detector requires some technical expertise. *See* Fed. R. Evid. 702 (referencing expert opinion testimony as testimony based on scientific, technical, or other specialized knowledge.) Defendant argues that Lt. Daugherty lacked the necessary skill to use the radar detector properly because he was not properly trained in the use of a radar detector. Defendant relies on Tenn. Code Ann. § 24-7-124(a) which states:

> In any judicial or administrative proceeding in which the results of a radar, laser or similar device used to measure the speed of a motor vehicle are being introduced for the purpose of proving the speed of the motor vehicle or the conduct of the driver of the vehicle, such results shall not be admissible for such purposes unless the law enforcement officer operating the device has been trained pursuant to guidelines established by the National Highway Traffic Safety Administration or the Tennessee peace officer standards and training (POST) Commission.

(Parentheses are original). Director Lane testified that every year during his employment with the 17th Judicial Drug Task Force, Lt. Daugherty has met the required POST training, but, as far as he is aware, none of the required POST training includes training in the use of

13

a radar detector. Defendant entered into evidence a copy of Section 1110-03-.09 of the Rules of the Tennessee Peace Officer Standards and Training Commission which states:

> Law enforcement officers shall receive initial or have previously attained training from a Certified Specialized Law Enforcement Instructor on the use of speed measurement devices. This training shall be substantially similar to the curriculum suggested by the NHTSA guidelines found in the Speed Measuring Device Operator Training Course Management Guide (version 12/01) for speed measuring devices and shall be completed prior to any testimony in a judicial or administrative proceeding.

[Defendant's Ex. 5]. This rule, however, was not effective until June 9, 2011, several months after the traffic stop in question. *Id.* Defendant also conceded at the suppression hearing that the undersigned is not bound by Tennessee statutes or rules in determining whether Lt. Daugherty is qualified to testify about the proper use of a radar detector, though defendant does argue that Tennessee law is "highly persuasive."

Lt. Daugherty testified he was certified in 1996 while employed by the Oneida Police Department on a radar unit similar to the one he presently uses. Director Lane also testified that he knew when he hired Lt. Daugherty that Lt. Daugherty had been certified in the use of radar while employed with the Oneida Police Department. The undersigned notes there was no certificate in his personnel file from the 17th Judicial Drug Task Force, but the undersigned has no reason to doubt Lt. Daugherty's or Director Lane's testimony in this regard. Lt. Daugherty has changed employers several times during the course of his career, and it is entirely possible all his records did not follow him. Moreover, Director Lane testified at the suppression hearing that the only training certificates he would have for Lt. Daugherty in the 17th Judicial Drug Task Force file would be those certificates Lt. Daugherty earned during his employment with the 17th Judicial Drug Task Force or those Lt. Daugherty had put in the file himself (Tr. 87-88). Additionally, Lt. Daugherty has

14

extensive experience using a radar detector; he has used the radar detector for three or four days each week for the past four and a half years. He also discussed in detail the various features of the radar detector during the suppression hearing. That Lt. Daugherty's training occurred so long ago is a concern and the more time that passes from the date of his training, the less relevant that training becomes. However, Lt. Daugherty's extensive and current use and experience with a radar detector mitigates some of that temporal distance in training, and I conclude Lt. Daugherty meets the minimum standards necessary to testify pursuant to Rule 702 regarding the proper use of a radar detector. Therefore, the undersigned will RECOMMEND defendant's motion to exclude Lt. Daugherty's testimony on the use of radar equipment be DENIED.

The next question to be answered is whether Lt. Daugherty actually did use the radar equipment properly when he used it to clock defendant driving 70 mph in a 55 mph zone. Defendant's expert in the use of radar, Mr. Farmer, had one primary concern about the manner in which Lt. Daugherty used the radar detector: the position of the patrol car to the oncoming traffic; Lt. Daugherty had parked his vehicle perpendicular to the interstate. Mr. Farmer testified he had been trained to park his vehicle parallel to the interstate and that he had never positioned a radar antenna so that it emitted its signal through a side window. However, Mr. Farmer also testified that *any* window in a vehicle could interfere with a radar antenna's signal (Tr. 106) and he did not opine that the side window was more likely to interfere with the signal than other windows in a vehicle. Mr. Farmer also testified that by parking parallel to the interstate the officer could see both the oncoming traffic and the radar unit's panel at the same time, but if one parked perpendicular, the officer would have to turn his head back and forth to see both (Tr. 106). While this assertion may be true, it does not

15

mean that the radar unit would improperly record the speed of an oncoming vehicle if the antenna was properly positioned on the patrol car. Furthermore, Mr. Farmer has not run radar since he retired from the TSHP in 2004, and he does not know if the TSHP still requires its officers to park parallel. Mr. Farmer's testimony failed to offer a solid technical reason why the radar would not work properly if the patrol car were parked perpendicular to the interstate. Thus, I do not conclude the function of the radar detector was impaired because Lt. Daugherty was parked perpendicular to the interstate with the radar antenna mounted on the back of the patrol car.

Mr. Farmer also took issue with Lt. Daugherty's testimony that only the defendant's vehicle was in the radar's "cone of vision" when it locked onto defendant's speed. Mr. Farmer did not find this testimony compatible with his other testimony that he had to wait to pull out after defendant passed him because here were vehicles following behind defendant. Mr. Farmer reasoned that if Lt. Daugherty had to wait for other cars to pass before he could pull out behind defendant, then the other cars must have been so close behind the defendant that when the radar locked onto defendant, the other cars must have been in the "cone." Whether there were other cars in the radar's "cone" is relevant because another car in the "cone" could have interfered with an accurate reading of the defendant's speed. It also has bearing on Lt. Daugherty's credibility as a witness.

Mr. Farmer's testimony, however, does not support his conclusion that there *must* have been more than one car in the radar's "cone" when Lt. Daugherty "locked" the radar onto defendant's car. Mr. Farmer also testified that in the dark on the interstate with fast moving traffic, an officer would want to have 500 to 800 feet between him and any oncoming cars before safely pulling out in front of them. Mr. Farmer testified that one

16

would need to be particularly careful in the dark because darkness makes it more difficult to determine the lane in which oncoming traffic is traveling. In this instance, as long as Lt. Daugherty's radar locked onto defendant's vehicle before it reached 800 feet past the rise, then there could have been west bound vehicles behind the rise which could have caused Lt. Daugherty to wait before pulling out after defendant. If a vehicle was behind the rise, it would not have been in the radar's "cone," and the radar equipment used by Lt. Daugherty on November 4, 2010 was fully capable of sending its signal as far as the rise. Further, defendant's vehicle would still have been in the 55 mph zone since the 70 mph zone did not begin until 974 feet past the rise. Thus, Lt. Daugherty's testimony that there was no other vehicle in the radar detector's cone when the radar captured defendant's speed is fully compatible with his testimony that he had to wait for other cars to pass before he pulled out into traffic to stop the defendant.

Another factor to consider in determining whether Lt. Daugherty had probable cause to stop defendant from speeding was his testimony that he visually observed defendant's headlights and determined defendant was traveling about 70 mph. Lt. Daugherty testified he has extensive experience visually estimating the speed of vehicle and has become very skilled doing so. He also testified that as part of his training on radar equipment, he was required to estimate the speed of oncoming vehicles to within three miles per hour of their actual speed. Defendant's own expert, Mr. Farmer, confirmed that one could become quite accurate at visually estimating the speed of a vehicle, even in the dark, with practice.

As to the issue of whether the radar detector was working properly, the evidence indicates it was. Lt. Daugherty had been testing it with the tuning forks about once a week

17

and a bench test performed on it four months after the traffic stop also indicated it was operating properly.

I also observed that when Lt. Daugherty asked the defendant about his speed immediately after approaching defendant's vehicle following the traffic stop, he specifically stated, "do you know the speed limit is 55 mph *coming down the mountain*." (Emphasis added). This statement is heard on the videotape of the traffic stop and supports the government's assertion that defendant *admitted* he was traveling 70 mph in a 55 mph zone – even though defendant had been traveling in a 70 mph zone for about three miles before he was pulled over. At the very least, it is reasonable that Lt. Daugherty would have understood defendant to be admitting he had been speeding.

Finally, defendant argues District Judge Aleta Traugher's decision in *United States v. Ruiz*, __ F.Supp.2d __, 2011 WL 2197651 (M.D. Tenn. June 6, 2011) is evidence that Lt. Daugherty is not a credible witness in this case. *Ruiz* also involved a traffic stop made by Lt. Daugherty based on speeding. Judge Trauger found Lt. Daugherty's testimony regarding exactly when and how he determined the defendant to be speeding to be inconsistent internally and with his written report of the incident. Judge Trauger also found it significant that another agent riding in the same vehicle with Lt. Daugherty could not confirm that the defendant had been speeding prior to the traffic stop. Additionally, Judge Trauger opined Lt. Daugherty appeared excessively nervous on the witness stand.

The undersigned is certainly in no position to second guess another court in another case, even if it involves the same witness in the case currently before the undersigned. Neither, however, is the undersigned bound by the other court's evaluation of that witness.

18

*See United States v. Atkins*, 1999 WL 1045942 *3 (6th Cir. Nov. 8, 1998) (the district court did not err in refusing to admit past judicial decisions of an officer's untruthfulness.)

I did not find Lt. Daugherty's testimony to be inconsistent internally or with the other evidence presented in the case, and I observed his demeanor which was serious but relaxed. I conclude he was being truthful.

## Conclusion

Based on all the considerations above, I conclude Lt. Daugherty had probable cause to believe defendant had been exceeding the speed limit on Interstate 24 when he pulled over the defendant. Therefore, it is RECOMMENDED[4] defendant's second motion to suppress (Doc. 58) be DENIED. For the reason stated, it is also RECOMMENDED that defendant's motion to exclude Lt. Daugherty's testimony regarding the proper use of a radar detector (Doc. 73) be DENIED.

S /*William B. Mitchell Carter*
UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).